The **CAYUGA INDIAN NATION OF NEW YORK, by its Chiefs, Franklin PATTERSON, James Leaffe, Vernon Isaac, Kenneth John, and Frank Bonamie, Individually and as Members of the Cayuga Indian Nation of New York, Plaintiffs,**

**and**

The **Seneca-Cayuga Tribe of Oklahoma, Plaintiff-Intervenor,**

**v.**

**Mario M. CUOMO,* as Governor of the State of New York; The State of New**

---

*\* Pursuant to Rule 25(d)(1) Mario M. Cuomo is substituted for Hugh L. Carey as defendant in* this action.

York; Miller Brewing Company; The County of Cayuga, New York; Consolidated Rail Corporation; David L. Koch; George G. Souhan; The County of Seneca, New York; and New York State Electric and Gas Corporation, Individually and as representatives of all others similarly situated, Defendants.

The CAYUGA INDIAN NATION OF NEW YORK, By its Chiefs, Franklin PATTERSON, James Leaffe, Vernon Isaac, Kenneth John, and Frank Bonamie, Individually and as Members of the Cayuga Indian Nation of New York, Plaintiffs,

and

The Seneca-Cayuga Tribe of Oklahoma, Plaintiff-Intervenor,

v.

William J. KIRK, Gail Kirk, Henry W. Koch, Barbara F. Koch, Robert Maier, Charles Hitchcock, Philo Bacon, Wilma Anthony, Daniel A. DePasquale, Alice M. DePasquale, Richard Hill, and Virginia Hill, Defendants.

Nos. 80–CV–930, 80–CV–960.

United States District Court, N.D. New York.

May 26, 1983.

As Amended Sept. 19, 1983.

Wender, Murase & White, Washington, D.C., Meggesto & Meggesto, Syracuse, N.Y., for plaintiffs; Arthur J. Gajarsa, Kenneth A. Marra, Washington, D.C., Judy Lewis Meggesto, Syracuse, N.Y., of counsel.

Shack & Kimball, P.C., Washington, D.C., Wiles, Fahey & Lynch, Syracuse, N.Y., for plaintiff-intervenor; Glenn M. Feldman, John B. Beaty, Washington, D.C., Joseph E. Fahey, Syracuse, N.Y., of counsel.

Robert Abrams, Atty. Gen. of N.Y., Albany, N.Y., Hale & Dorr, Goodwin, Proctor & Hoar, Boston, Mass., Huber Lawrence & Abell, New York City, Hiscock, Lee, Rogers, Henley & Barclay, Syracuse, N.Y., for defendants; Jeremiah Jochnowitz, Asst. Sol. Gen., Albany, N.Y., James D. St. Clair, William F. Lee, Donald R. Frederico, Allan Van Gestel, Jeffrey C. Bates, Boston, Mass., Howard M. Schmertz, New York City, Richard D. Davidson, Syracuse, N.Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

The Cayuga Indian Nation and five chiefs of that tribe seek a declaration of their current ownership of and right to possess a 64,015 acre tract of land in central New York State, an award of fair rental value for the almost 200 years during which they have been out of possession, and other monetary and protective relief. The Cayugas allege that this tract is reserved for their tribe by treaties with both the United States and the State of New York, and has been subject to a restraint against alienation under the Nonintercourse Act, now codified at 25 U.S.C. § 177. Though the tract was conveyed to the State through transactions in 1795 and 1807, and thereafter conveyed, in large part, to private purchasers, the Cayugas claim that under federal law their right to possession has never been extinguished.

This suit is one of a recent series of land claims brought by eastern Indian tribes in the federal courts.[1] Such claims have imposed upon the courts the painful task of determining whether, and how, federal commitments to tribes are to be enforced against states, against municipalities, and against innocent non-Indians who have for generations considered the land their own. Most of the claims, like this one, challenge the validity of conveyances by the tribes which occurred after the adoption of the Constitution, and after the enactment of the first Nonintercourse Act. Although as of this date only one such claim has reached a final judgment for the plaintiffs, *Oneida Indian Nation of New York v. County of Oneida,* 70–CV–35 (N.D.N.Y. Oct. 5, 1981) (Port, J.), *appeals docketed,* (2d Cir. June 11, 1982; June 24, 1982), others have withstood a variety of challenges to the jurisdiction of the court and the legal sufficiency of the complaint.

For example, it has been established that a claim asserting a possessory right conferred by treaty and protected by the Nonintercourse Act is within the subject matter jurisdiction of the federal court, *Oneida Indian Nation of New York v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); that the claim may be maintained by any bona fide Indian tribe, *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 377 (1st Cir.1975); *Narragansett Tribe of Indians v. So. R.I. Land Devel. Corp.,* 418 F.Supp. 798, 808 (D.R.I.1976); and may be maintained without joinder of the federal government, *Narragansett Tribe of Indians v. So. R.I. Land Dev. Corp., supra,* 418 F.Supp. at 810–813; that defenses based upon state law such as adverse possession, statutes of limitation, laches, or estoppel by sale are unavailable to the defendants, *Mohegan Tribe v. State of Connecticut,* 638

---

1. It is likely that this recent surge of tribal land claims was prompted, in large part, by the enactment of 28 U.S.C. § 2415 which, as amended, set a deadline of December 31, 1982 for the filing of certain claims. For a discussion of other factors in the revival of these long-dormant claims, see Clinton & Hotopp, Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims, 31 *Me.L.Rev.* 17, 47–49 (1979–80).

F.2d 612, 615 n. 3 (2d Cir.1980); *Oneida Indian Nation v. County of Oneida,* 434 F.Supp. 527, 541–44 (N.D.N.Y. 1977); *Schaghticoke Tribe of Indians v. Kent School Corp.,* 423 F.Supp. 780, 783–85 (D.Conn.1976); *Narragansett Tribe of Indians v. So. R.I. Land Devel. Corp., supra,* 418 F.Supp. at 803–06; that the Nonintercourse Act was meant to apply throughout the United States and not only to land in "Indian Country", *Mohegan Tribe v. State of Connecticut, supra,* 638 F.2d 612; and is not geographically limited by the "surrounded by settlements" exception in the Trade and Intercourse Acts. *Narragansett Tribe of Indians v. So. R.I. Land Devel. Corp., supra,* 418 F.Supp. at 808–809.

Further instruction on the maintainability of tribal land claims has recently appeared in a Second Circuit decision reviewing the dismissal of one such action by this Court. *Oneida Indian Nation of New York v. State of New York,* 691 F.2d 1070 (2d Cir.1982), *aff'g in part and rev'g in part Oneida Indian Nation of New York v. State of New York,* 520 F.Supp. 1278 (NDNY 1981). Although *Oneida* largely concerned a pre-constitutional claim (it was alleged that conveyances in 1785 and 1788 were invalid under Article IX, clause 4 of the Articles of Confederation), the Court's discussion of the availability of particular defenses is largely applicable to any tribal claim which asserts the nonalienability of Indian land under federal law. Thus it is pertinent here that the Second Circuit rejected in *Oneida* defenses based on the Eleventh Amendment immunity of states, *id.* at 1079–80, the nonjusticiability doctrine, *id.* at 1080–1083, state time-bars, *id.* at 1083–84, and federal time-bars, *id.* at 1084.

Presently before the Court are further challenges to jurisdiction and the legal sufficiency of a tribal land claim. These challenges are raised by means of (1) a joint motion by the Counties of Cayuga and Seneca, Miller Brewing Company, Consolidated Rail Corporation, and New York State Electric and Gas Corporation (hereinafter "the non-state defendants"), who appear individually and as representatives of the defend-

ant class, to dismiss the complaint pursuant to Rules 12(b)(1) and (6), Fed.R.Civ.P., and (2) a motion by the State of New York and Governor Carey (hereinafter "the state defendants"), also individually and as representatives of the defendant class, to dismiss the complaint pursuant to Rules 12(b)(1), (2) and (6), Fed.R.Civ.P.

The arguments raised by the defendants in support of their motions are, to a large extent, variants of arguments presented to this and other courts in previous tribal land claim litigation. *E.g.,* sovereign immunity, nonjusticiability, statutes of limitations, geographic nonapplicability of the Nonintercourse Act, equitable defenses. These have invariably been rejected in such cases and must be rejected in this case as well. The defendants have advanced other arguments herein which lead the Court into less well-charted territory. *E.g.,* unavailability of an implied right-of-action under the Nonintercourse Act or of a federal common law remedy, abatement of statutory claims. However, for the reasons stated below, these relatively new contentions do not warrant dismissal of the complaint.

## I. THE PARTIES

### A. The Plaintiffs

The plaintiff Cayuga Indian Nation of New York asserts that it is an Indian Nation or Tribe recognized by the United States and principally situated in New York State, though without a reservation. Its members maintain that they are the "direct successors in interest" to the Cayuga Nation of the Six Nation Iroquois Confederacy which, until the acts complained of in this suit, had occupied the subject land in New York State since time immemorial. They state that tribal relations have been continuously maintained to the present time.

By *Memorandum-Decision and Order* of November 9, 1981, the Court granted a motion by the Seneca-Cayuga Tribe of Oklahoma to intervene as a plaintiff in this suit, pursuant to Rule 24, Fed.R.Civ.P. The Seneca-Cayuga Tribe had established sufficient interest in the action for the purpose of

intervention by their allegations that, at the time of the challenged transactions, it had been "incorporated within and was a part of the Cayuga Nation of Indians." According to the Intervenor, the Cayugas split into two branches after they lost their Original Reservation to New York State. One branch settled in Western New York State, and is, apparently, the branch represented by the Cayuga Indian Nation of New York. The Intervenor Seneca-Cayuga Tribe purports to represent the other, larger branch of the Cayugas, which had moved first to Ohio, then to "Indian Territory" (now Oklahoma). The Order permitting intervention does not impair the right of the plaintiff Cayuga Indian Nation of New York or the defendants to challenge the Intervenor's entitlement to a share of the recovery from this lawsuit, if any is ultimately awarded.[2]

### B. The Defendants

The initial complaint in this action, filed November 19, 1980, named numerous defendants sued individually and as representatives of a proposed class of "all other persons who assert an interest in any portion of the Original Reservation lands...." *Complaint* ¶ 25. Those named included the Governor of New York, numerous administrative agencies, authorities and officials, the Counties of Cayuga and Seneca, various local governmental entities and officials, and various commercial and individual landowners. Plaintiffs have estimated the number of persons asserting an interest in the land as exceeding 7,000 individuals and entities.

On December 1, 1980, the plaintiffs commenced a second action, *Cayuga Indian Nation v. William J. Kirk, et al,* 80–CV–960, asserting the same legal claim against twelve individual owners of land in the contested area. By *Memorandum-Decision and Order* of March 25, 1981, 89 F.R.D. 627, this Court ordered the consolidation of the two actions brought by the Cayugas, pursuant to Rule 42(a), Fed.R.Civ.P.

By that same *Memorandum-Decision and Order,* as amended, this Court certified a defendant class, pursuant to Rule 23(b)(1)(B), Fed.R.Civ.P., for the purpose of litigating certain specified but key issues in this lawsuit. After notice to the class and a hearing, at which several individuals and a corporation lodged objections to the certification, all objections were overruled and a motion to decertify the class was denied. *Order* of March 31, 1982. A list of those named defendants who have been designated as representatives of the class for the purpose of this motion appears in the title of this decision.

## II. FACTUAL ALLEGATIONS

Plaintiffs allege that from time immemorial until the late eighteenth century the Cayuga Nation owned and occupied over 3,000,000 acres in what is now central New York State. They produce as an exhibit to their complaint in 80–CV–930 a map indicating a strip of land, about 50 miles wide, running from Lake Ontario to the Pennsylvania border; the strip is labeled "Cayuga Aboriginal Land Area". The present suit is not an assertion of possessory rights to the entire Aboriginal Land Area, but to a portion thereof which was purportedly reserved for the Cayugas, then lost, in the course of the events alleged below.

During the colonial period in our history, the British Crown pursued a policy of protecting Indian tribes in the peaceful protection of their land. In furtherance of this policy, a treaty was concluded in 1768 at Fort Stanwix, establishing a boundary between the American colonies and the Six Nations—an Indian confederation comprised of the Oneida, Tuscarora, Mohawk, Onondaga, Cayuga and Seneca Nations. Plaintiffs state that a portion of this boundary corresponded to a portion of the eastern boundary of the Cayuga aboriginal territory.

---

**2.** Although plaintiff Cayuga Indian Nation of New York and the plaintiff-intervenor Seneca-Cayuga Tribe have submitted separate briefs in opposition to the motions to dismiss, the briefs are similar enough to permit the Court to treat them collectively in this opinion, by referring to the allegations or arguments of "the plaintiffs" or "the Cayugas".

At the conclusion of the American Revolution, Congress assumed authority over relations with Indians, pursuant to Article IX, clause 4 of the Articles of Confederation.[3] In exercise of its new authority, and allegedly to promote peaceful relations with the Indian tribes, Congress issued a Proclamation in 1783 which reiterated its "sole and exclusive", but qualified, right to regulate trade and manage affairs with Indians. In addition, it prohibited the purchase of or settlement on certain Indians' lands without the express authority and direction of the federal government.

The following year, federal commissioners met with the Six Nations and concluded the Treaty of Fort Stanwix, 7 Stat. 15 (1784). Article II of the Treaty delineated the boundaries of the Six Nations, including the boundary of the Cayuga Nation.

Notwithstanding the federal restrictions under the Articles of Confederation, the Proclamation of 1783 and the 1784 Treaty of Fort Stanwix, the State of New York concluded a treaty with the Cayuga Indian Nation on February 25, 1789 in Albany; the Cayugas thereby relinquished all of their lands to New York, reserving for their own tribal use the 64,015 acres that is the subject of this action. This remaining area, referred to by the Cayugas as the "Original Reservation", is depicted on the map attached to the complaint as two swaths of land on the eastern and western shores at the northern end of Cayuga Lake.

Less than a week later, on March 2, 1789, the United States Government under the Constitution commenced. *See, Oneida Indian Nation of New York v. State of New York,* 520 F.Supp. 1278, 1323 (NDNY 1981).

In 1790, Congress enacted the first in a series of Trade and Intercourse Acts, *Act of July 22, 1790,* ch. 33, 1 Stat. 137, pursuant to Congress' authority under Article I, § 8, clause 3 of the Constitution. Section four of that Act constituted the first Nonintercourse Act. It provided:

> ... That no sale of lands made by any Indians or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of pre-emption to such lands or not, unless the same shall be made or duly executed at some public treaty, held under the authority of the United States.

The Trade and Intercourse Act of 1790, which included the above-quoted Nonintercourse Act, was a temporary measure, and expired in 1793. It was replaced by the Trade and Intercourse Act of 1793, *Act of March 1, 1793,* ch. 19, 1 Stat. 329, which in Section 8, contained a revised Nonintercourse Act:

> ... That no purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the Constitution. . . .

The Act went on to establish penalties for its violation, and to carve certain exceptions to its coverage. The "non-alienability clause" set forth above has remained substantially the same through successive re-enactments of the Act, and is now codified at 25 U.S.C. § 177.

The Cayugas next state that on November 11, 1794, the Six Nations concluded another treaty with the United States at Canandaigua. This treaty, 7 Stat. 44, acknowledged the Original Reservation retained by the Cayugas through their treaty of 1789 with New York State, and contained a promise by the United States that the land would remain theirs until the Cayugas "chose to sell the same to the people of

---

**3.** The Articles of Confederation, Art. 9, cls. 1, 4, provides in pertinent part:

> The United States in Congress assembled shall have the sole and exclusive right and power of determining on peace and war . . . entering into treaties and alliances . . . .

> The United States in Congress assembled shall also have the sole and exclusive right and power of . . . regulating the trade and managing all affairs with the Indians, not members of any of the states, provided that the legislative right of any state within its own limits be not infringed or violated.

the United States who have the right to purchase."

We are then told that on June 16, 1795, William Bradford, then Attorney General of the United States, issued an opinion on the question of whether the State of New York had a right to purchase land from the Six Nations or from any of the individual tribes without the participation of the federal government. The Attorney General concluded that, under the Nonintercourse Act of 1793, no sale of land by an Indian tribe was valid, nor could the claims of the New York Indians be extinguished, except by a treaty entered into by the federal government.

On July 27 of that same year, however, while the Nonintercourse Act of 1793 was still in effect, a treaty was entered into at Cayuga Ferry, New York, by which New York State acquired the entire Cayuga reservation except for a three mile parcel on the eastern shore of Cayuga Lake. As consideration, the state agreed to pay the Cayuga Nation $1,800 annually in perpetuity.

■ Plaintiffs allege that the treaty negotiations were conducted by state officials without the consent and approbation of the federal government. A federal official, Israel Chapin, was among those who signed the treaty on July 27 as a witness, but he purportedly informed the Secretary of War Pickering shortly thereafter that he had attended the treaty signing as a private individual and not as a commissioner representing the United States.[4]

The Nonintercourse Act was re-enacted in 1796, *Act of May 19, 1796,* ch. 30, 1 Stat. 469, § 12; in 1799, *Act of March 3, 1799,* ch. 46, 1 Stat. 743 § 12; and in 1802, *Act of March 30, 1802,* ch. 13, 2 Stat. 139 § 12. In 1807, during the effective period of the 1802 Act, New York State purchased the remaining three mile parcel held by the Cayugas for $4,800. Plaintiffs allege that this conveyance, too, was without the consent and approbation of the federal government.

### III. PLAINTIFFS' CLAIM

Plaintiffs have styled their suit "a defendant class action to declare plaintiffs' current ownership of and right to possess certain lands in the State of New York ... the right to which is conferred by federal law and which is subject to restrictions against alienation."[5] *Complaint* ¶ 1. Their claim for relief assertedly arises under Article IX of the Articles of Confederation; the Proclamation of 1783; the Treaty of Fort Stanwix (1784); the Treaty of Canandaigua (1794); Article I, Section 8 of the United States Constitution (the Commerce Clause); 25 U.S.C. § 177 and its predecessor, the 1790 Nonintercourse Act, Article 37 of the 1777 New York Constitution, and the common law. Elsewhere in the Complaint, plaintiffs add that their title is protected by the Fifth and Fourteenth Amendments to the United States Constitution. *Complaint* ¶ 49.[6] With respect to the common law

---

**4.** In ¶ 47 of their Complaint, plaintiffs allege that Chapin wrote again to Secretary Pickering, to inform him of a grievance expressed to him by a party of Cayugas from the reservation. The Cayugas allegedly explained that the land was sold out from under them; that those who signed on behalf of the Cayugas were Canadian Indians and not residents of the reservation; that the remaining three mile parcel was too small for their usage. Since plaintiffs' claim is based on the nonalienability of the parcel, and not on the unfairness of the transaction, this particular allegation is surplusage.

**5.** Because of the peculiar nature of tribal land tenure, the Cayugas do not claim to hold fee title to the land, such title having been appropriated by the European sovereign upon "discovery". *See, Oneida Indian Nation of New*

*York v. State of New York,* 691 F.2d at 1074–75. Plaintiffs' claim is to the "Indian title" or "right of occupancy", long recognized to be "good against all but the sovereign". *Oneida Indian Nation of New York v. County of Oneida,* 414 U.S. at 667, 94 S.Ct. at 777 (1976). *See, Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); *Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823). *See also,* note 10, *supra.*

**6.** At one point in their papers, the Cayuga Indian Nation of New York refers to the action as one for "a declaratory judgment and ancillary relief." *Plaintiff's Memorandum of Law* at 7. However, the applicability of 28 U.S.C. § 2201, which authorizes that remedy, is nowhere discussed by the parties.

bases for their claim, references are made in plaintiffs' papers to "ejectment", "trespass", "waste" and "conversion", either as analogous forms of action or as indices of damages.

The Seneca-Cayugas, in their *Amended Complaint in Intervention,* at 2, invoke 42 U.S.C. § 1983 as a further statutory basis for the action.

As is apparent, the plaintiffs are not specifying a single source for their substantive possessory right, or a single source for their right of action. However, it may be noted here that the particular theory of plaintiffs' case which has been the focus of argument and is the focus of this decision is that plaintiffs' substantive right to the subject land has been confirmed by federal and state treaties, and has been subject to the restraint against alienation in the Nonintercourse Act; that the right to maintain this action is derived from the Nonintercourse Act itself or from federal common law.

The relief sought by plaintiffs is (1) a declaration of their current ownership and right to possess the land in question; (2) an order restoring the plaintiffs to possession of the land and ejecting the defendants; (3) an accounting of all taxes paid on the land from 1795 to the present; (4) trespass damages in the amount of the fair rental value of the land since plaintiffs' dispossession; (5) establishment of a fund, comprised of all proceeds of any sales of the land in issue, for the satisfaction of trespass damages; (6) establishment of a fund, comprised of all tax proceeds collected by defendant counties for the land, for the satisfaction of trespass damages; (7) restitution for the value of all timber, oil, gas, coal, or other matter of value which has been extracted or removed from the land; and (8) establishment of a fund comprised of all future proceeds from the extraction or removal of the above natural resources.

## IV. SUBJECT–MATTER JURISDICTION

■ The initial complaint invokes federal jurisdiction under 28 U.S.C. §§ 1331, 1337 and 1362. Plaintiff-Intervenors add § 1343(3) as the jurisdictional basis for their claim of deprivation of Constitutional and statutory rights. Having determined that the suit presents a federal controversy brought by an Indian tribe, the Court concludes that it has jurisdiction over the subject matter of this claim pursuant to § 1331 and § 1362.

In *Oneida Indian Nation of New York v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (hereinafter "*Oneida v. County of Oneida*"), the Supreme Court considered a tribal claim conceptually identical to the claim now asserted by the Cayugas. The Oneidas alleged aboriginal ownership of a vast area of what is now New York State and further alleged that their right to possess a more modest area was confirmed by treaties with the federal government, including the Treaty of Fort Stanwix (1784) and the Treaty of Canandaigua (1794). Notwithstanding these treaties, and despite the restraint on alienability in the Nonintercourse Act of 1793, a portion of the land reserved to that tribe was ceded to New York State in 1795.

The Court viewed the complaint in *Oneida v. County of Oneida* as asserting "a current right to possession conferred by federal law", *id.* at 666, 94 S.Ct. at 776, and concluded:

> Given the nature and source of the possessory rights of Indian tribes to their aboriginal lands, particularly when confirmed by treaty, it is plain that the complaint asserted a controversy arising under the Constitution, laws, or treaties of the United States within the meaning of both § 1331 and § 1362.

*Id.* at 667, 94 S.Ct. at 777.

■ Neither of the movant-defendants attempt to distinguish *Oneida v. County of Oneida* from the case at bar, or otherwise contend that its holding is inapplicable here. Instead, the defendant New York State seeks to exclude itself from the jurisdiction of this Court by asserting sovereign immunity under the Tenth and Eleventh Amendments. That defense is addressed below, but it is noted here that the immunity of

the State would at most deprive the Court of jurisdiction over the State, and not over the subject matter.

■ Although the non-state defendants have also moved to dismiss for lack of subject matter jurisdiction, the defenses they assert either challenge the timeliness or legal sufficiency of the complaint (statutes of limitations, equitable defenses, geographic non-applicability of the Nonintercourse Act, no right of action, abatement of statutory claims) or the justiciability of the claim, which is a *sui generis* ground for dismissal, not a jurisdictional defect. *See, Powell v. McCormack*, 395 U.S. 486, 512, 89 S.Ct. 1944, 1959, 23 L.Ed.2d 491 ("there is a significant difference between determining whether a federal court has 'jurisdiction over the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is justiciable").

Thus, none of the contentions advanced by the movants upsets our initial conclusion that the Court has jurisdiction over the subject matter of this action.

## V. SOVEREIGN IMMUNITY

■ Defendant New York State seeks dismissal of the claim against it by reason of its sovereign immunity preserved by the Tenth Amendment or created by the Eleventh Amendment. In effect, the State requests this Court to reconsider its recent determination, in *Oneida Indian Nation of New York v. New York State*, 520 F.Supp. 1278, 1301–08 (NDNY 1981) (hereinafter "*Oneida v. New York*"), that Congress, in enacting 28 U.S.C. § 1362, abrogated the state's Eleventh Amendment immunity from tribal suits.[7]

In the interim between the submission of papers on this motion and the issuance of this decision, that particular holding of *Oneida v. New York* was affirmed by the Second Circuit. In *Oneida v. New York*, 691 F.2d 1070 (2d Cir.1982), the Court of Appeals stated as its premise that,

When the states granted to Congress the power "[t]o regulate commerce ... with the Indian tribes," U.S. Constitution, Art. I, § 8, cl. 3, they necessarily "surrendered a portion of their sovereignty," *Parden v. Terminal Railway*, 377 U.S. 184, 191 [84 S.Ct. 1207, 1212, 12 L.Ed.2d 233] (1964), and thereby granted Congress the power to abrogate the state's immunity from suits upon claims arising out of such regulation.

*Id.* at 1079–80.

The Court then noted that the purpose of 28 U.S.C. § 1362, as discerned in *Moe v. Confederated Salish & Kootemai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) was "to open the federal courts to the kind of claims that could have been brought by the United States as a trustee, but for whatever reason were not so brought." *Id.* at 1080, citing *Moe, supra,* 425 U.S. at 472, 96 S.Ct. at 1636. Satisfied that the Eleventh Amendment would not bar a suit brought by the federal government on behalf of an Indian tribe, the Court concluded that Congress, in enacting § 1362, "indicate[d] an intent to remove the state's 11th Amendment immunity in suits brought by tribes." *Id.* at 1080. In closing the Court specified that states are subject to monetary damages as well as declaratory and injunctive orders under § 1362.

■ There was no assertion of Tenth Amendment immunity in *Oneida v. New York*, as there is by the State here; however, that precise defense was recently considered, and unequivocally rejected, in *Mohegan v. Connecticut*, 528 F.Supp. 1359, 1367–69. This Court is in full agreement: there is no support for the view that the Tenth Amendment preserves any preconstitutional attributes of sovereign immunity which have not been abrogated by Congress and which would bar this type of claim. On the contrary, the rationale of the *Oneida v. New York* holding clearly applies—perhaps

7. 28 U.S.C. § 1362. *Indian tribes* The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

in even greater force—to the defense of Tenth Amendment immunity: the States implicitly granted Congress the power to abrogate their immunity with respect to Indian affairs within the scope of Congressional power under Article I; Congress exercised that power when it enacted § 1362. The explicit reservation of immunity in the Eleventh Amendment therefore cannot bar this action; *a fortiori,* any vestige of immunity under the more general Tenth Amendment would also be ineffectual.

■ There are, of course, some attributes of state sovereignty which are specifically protected by the Tenth Amendment from the exercise of Congressional power under the Commerce Clause. *See National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). But the scope of such immunity is narrow, applying only where the state can show that (1) the challenged statute regulates the "States as States," (2) the statute addresses matters that are indisputable attributes of state sovereignty; (3) compliance would impair the state's ability "to structure integral operations in areas of traditional governmental functions." *Equal Employment Opportunity Commission v. Wyoming,* —— U.S. ——, 103 S.Ct. 1054, 1060–61, 75 L.Ed.2d 18 (1983), *citing Hodel v. Virginia Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 286–288, 101 S.Ct. 2352, 2364, 69 L.Ed.2d 1 (1981). It can hardly be contended, and New York does not contend, that the enforcement of the Nonintercourse Act can be avoided on immunity grounds under the *Usery* doctrine.

## VI. JUSTICIABILITY

The non-state defendants have also asked this Court to renounce an aspect of its decision in *Oneida v. New York,* and hold that plaintiffs' claim is not justiciable. The argument is twofold: (A) the relief requested cannot be judicially molded, and (B) the action presents solely political questions.

### A. *Availability of Relief*

Defendants have cited this Court's recognition, in *Oneida v. New York,* that "seri-

ous, if not insurmountable problems ... would arise out of granting the plaintiffs the relief they seek," 520 F.Supp. at 1296, and that "an award of possession ... would create utter chaos and disaster to many, socially, economically, and politically." *Id.* at 1295. They build upon these concerns by describing in their brief the more dramatic potential consequences of an award of possession: *e.g.,* the loss of homes, businesses, and municipal facilities; the transfer of sovereignty over the land and its unwilling inhabitants to the Cayuga Indian Nation and its tribal government.

■ The dire warnings of the defendants are not unheard by this Court, and should plaintiffs ultimately prevail the utmost circumspection and restraint will be employed in fashioning an appropriate remedy. But the fact that a particular remedy sought may be unavailable or impractical as too disruptive or unfair does not render a lawsuit unjusticiable, so long as there is some form of relief that the Court could fashion. *Cf. Powell v. McCormack,* 395 U.S. 486, 498–99, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491. By way of example and not prediction, it may be noted that in the one recent tribal claim to reach final judgment, plaintiffs were awarded historically adjusted monetary damages as compensation for the illegal alienation of their land. *Oneida v. County of Oneida, supra,* 70–CV–35 (May 5, 1982), *appeals docketed* (by plaintiffs, June 11, 1982; by defendant, June 24, 1982).

In *Oneida v. New York,* where the tribal plaintiffs sought some five million acres of New York land, this Court concluded that there were standards by which to formulate some relief should the plaintiffs establish their claim, 520 F.Supp. at 1297, and the claim was therefore justiciable. The Second Circuit upheld this Court on that point, observing that "Indian land claims have traditionally been asserted in the courts of this country for resolution." 691 F.2d at 1081. *See also, Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 388 F.Supp. 649, 664 (D.Me.), *aff'd,* 528 F.2d 370 (1st Cir.1975). In the Second Circuit's view, plaintiffs' request for a declaration of its

possessory rights renders the claim justiciable, even if no other relief can be devised. *Id.* at 1082, *citing Powell v. McCormack, supra,* 395 U.S. at 517, 89 S.Ct. at 1961. But it refused to concede that a compensatory remedy could not be fashioned, or that "fair rental value" was an indeterminable basis for damages. Moreover, in response to an argument that the scale of the claim rendered it unjusticiable, the Court wrote, "we know of no principle of law that would relate the availability of judicial relief to the gravity of the wrong sought to be redressed." *Id.* at 1083.

■ Defendants assert that great disruption has already been caused by the mere filing of this suit, and will worsen over the course of what promises to be lengthy litigation. The Court is aware of this and joins with other courts and commentators in regretting that too few of the eastern tribal land claims have been resolved by legislation or negotiated settlement. *See, e.g., Oneida v. New York,* 691 F.2d at 1081–82; *Oneida v. County of Oneida,* 434 F.Supp. at 531; *Comments: Indian Land Claims Under the Nonintercourse Act,* 44 *Albany L.Rev.* 110, 134–37; Clinton and Hotopp, *supra,* 31 *Me.L.Rev.* at 89. But in the absence of such preferable solutions, access to the courts is and must be available, and the hardship inflicted upon parties *pendente lite* does not render the suit nonjusticiable.

B. *Political Question*

Defendants next contend that this action poses solely political questions and is thus nonjusticiable under *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1961). They maintain that the issues raised have been constitutionally committed to either the President or Congress, and that adjudication by the Court creates a "potential for embarrassment resulting from multifarious pronouncements by various branches of the federal government." *Baker v. Carr, supra,* 369 U.S. at 217, 82 S.Ct. at 710.

The identical arguments were raised by the defendants in *Oneida v. New York* and rejected, both in this Court and on appeal.

In so doing, the Second Circuit observed that the political question doctrine is " 'essentially a function of separation of powers'," *citing Baker v. Carr, supra* at 217, 82 S.Ct. at 710, and it concluded that:

> adjudication of Indian land claims such as the instant action is wholly consistent with the prevailing conceptions of the relationship among the three branches of government concerning the appropriate means to redress the historical wrongs committed against the Native American.

691 F.2d at 1081. The Court then added that the executive and legislative branches of the federal government have acknowledged the justiciability of such claims, and that, to its knowledge, no Indian land claim had ever been dismissed as nonjusticiable. *Id.* at 1081–82.

■ In light of the Second Circuit decision in *Oneida v. New York,* it can no longer be seriously maintained that tribal land claims are nonjusticiable due to the difficulty of molding relief or due to the possible strain on our political concept of the separation of governmental powers.

VII. STATUTE OF LIMITATIONS

■ The two transactions which are challenged in this lawsuit occurred over 1¾ centuries ago. One might expect that the term of some applicable statute of limitations would have long ago elapsed, shielding the defendants from the disruption and prejudice inherent in defending an aged claim. Nevertheless, the Second Circuit decision in *Oneida v. State of New York* makes it clear that this claim is not time-barred.

At the outset of its discussion, the Court rejected the view that a state statute of limitations could bar the action *ex propre vigore.* The Court's reasoning was that "the United States as a trustee on behalf of an Indian tribe would not be subject to state delay-based defenses," and therefore, "[i]t would be anomalous to allow the trustee to sue under more favorable conditions than those afforded the tribes themselves." 691 F.2d at 1083–84.

However, the defendants do not contend here that the state statute governs of its own force and effect. Instead, they—to be precise, the state defendants—argue that there is no federal statute of limitations which is applicable to plaintiff's claim, and that under such circumstances the most analogous state statute of limitations should be "borrowed" and applied as federal law. *See, Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979); *Johnson v. Ry. Express Agency, Inc.,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975). This Court is thus invited to reject the view taken in *Capitan Grande Bank of Mission Indians v. Helix Irrigation Dist.,* 514 F.2d 465, 471 (9th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975), and by Judge Port in *Oneida v. County of Oneida, supra,* 434 F.Supp. at 542, that 28 U.S.C. § 2415 governs the timeliness of actions brought by tribes on their own behalf, as well as those brought by the United States as trustee.[8]

■ The state defendants' argument for a restrictive reading of 28 U.S.C. § 2415 (and for a correspondingly restrictive reading of *Capitan Grande* and *County of Oneida*) is weighty, but now academic. The Second Circuit has answered "the question whether a delay based defense founded on federal law may be asserted," holding that "at the very least suits by tribes should be held timely if such suits would have been timely if brought by the United States." *Oneida v. New York,* 691 F.2d at 1084. That holding is dispositive as to the timeliness of this action. The Cayuga's cause of action accrued prior to 1966 and was filed prior to December 31, 1982. The United

States could have brought this action on behalf of the tribe. 28 U.S.C. § 2415(a), (c), (g). It is at least as timely though brought by the Cayugas themselves.

## VIII. EQUITABLE DEFENSES

The non-state defendants also advance a delay-based defense, invoking certain common law principles of equity. Relying upon *Felix v. Patrick,* 145 U.S. 317, 12 S.Ct. 862, 36 L.Ed. 719 (1892) and *Yankton Sioux Tribe of Indians v. United States,* 272 U.S. 351, 47 S.Ct. 142, 71 L.Ed. 294 (1926), they contend that the equitable remedies of rescission and restitution are no longer available where the use and value of the land claimed has changed drastically, and where it is held by innocent purchasers.

■ In the Court's view, this argument may still be pertinent to the appropriateness of particular remedies, but can no longer refute the timeliness or maintainability of the action. As discussed in the preceding section, Congress has determined such claims to be timely when brought by the United States, 28 U.S.C. § 2415; and the Second Circuit has made it clear that tribal claims brought within that statutory period are also timely. *Oneida v. New York, supra,* 691 F.2d at 1084. An equitable argument that the action is untimely due to changed circumstances cannot override federal legislation. *See, Oneida v. New York, supra; Oneida v. County of Oneida, supra,* 434 F.Supp. at 542.

This is not to say that the equitable considerations noted in *Felix v. Patrick* and in *Yankton Sioux Tribe* will play no role in this lawsuit. Should plaintiffs ultimately prevail, equitable factors will be carefully

---

8. 28 U.S.C. § 2415. *Time for Commencing actions brought by the United States*

(a) ... an action for money damages brought by the United States for or on behalf of a recognized tribe, band, or group of American Indians shall not be barred unless the complaint is filed more than six years and ninety days after the right of action accrued: *Provided further,* That an action for money damages which accrued on the date of enactment of this Act in accordance with subsection (g) ... shall not be barred unless the complaint is filed after December 31, 1982....

(c) Nothing herein shall be deemed to limit the time for bringing an action to establish the title to, or right of possession of, real or personal property.
. . . .
(g) Any right of action subject to the provisions of this section which accrued prior to the date of enactment of this Act shall, for purposes of this section, be deemed to have accrued on the date of enactment of this Act.

weighed before any relief is granted. *See, Oneida v. New York, supra,* 520 F.Supp. at 1296. And, as stated previously in the discussion of justiciability, any such relief will be fashioned with the utmost restraint. However, those equitable factors do not render this action unmaintainable.

■ As a further equitable defense, the non-state defendants argue that a claim for recission cannot be asserted against parties not in privity with the plaintiff unless fraud is alleged. Their support for this proposition is *Gordon v. Burr,* 506 F.2d 1080 (2d Cir.1974), in which a purchaser of stock was allowed the remedy of rescission against a salesman where there was fraud, despite a lack of privity. Defendants' argument is faulty for several reasons. First, the Cayugas are not seeking rescission, or equitable cancellation of the conveying instruments—a remedy generally available only where the party lacks a plain, adequate, and complete remedy at law. 12A *C.J.S.* Cancellation of Instruments §§ 10, 11 (1980). Instead, they seek the appropriate legal remedy for one out of possession who claims a paramount right to possession: recovery of possession and damages through an action in ejectment. 28 *C.J.S.* Ejectment § 1–2, 25b (1941). Such an action may be maintained against a defendant in possession of the property, without regard for privity of estate or contract. 28 *C.J.S.* Ejectment §§ 25(2), 32.

Moreover, the holding in *Gordon v. Burr, supra,* is simply not instructive as to the availability of rescission with respect to the case at bar. In *Gordon,* the Court acknowl-

edged that privity is ordinarily required "where an action for rescission is based on a contract theory—mistake or breach of contract ... see, generally 3 Corbin Contracts § 613 (1960); 5 *id.* § 1104." 506 F.2d at 1083. It then declared the inapplicability of that privity requirement where "a suit is predicated on fraud." The Cayugas' claim, however, is not predicated on mistake, breach of contract, or fraud; it is predicated on the inalienability of tribal land under federal law. Nothing in *Gordon v. Burr* or any other case to the Court's knowledge limits the availability of rescission, in this type of claim, to plaintiffs in privity of contract with the defendant.[9]

Thus, neither of the equitable defenses asserted herein warrant either dismissal of the claim or the preclusion of any particular remedy against the non-state defendants.

## IX. LEGAL SUFFICIENCY OF THE CLAIMS

In determining whether the plaintiffs have stated a claim upon which relief can be granted, we accept as true all material factual allegations in the complaint, and construe the complaint in favor of the complaining party. *Scheur v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Oneida v. New York,* 691 F.2d at 1074 (2d Cir.1982). Dismissal under Rule 12(b)(6), Fed.R.Civ.P., is not warranted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*

---

**9.** In the course of arguing this point, the parties devoted considerable attention to issues which are more pertinent to a conceptually similar defense: that the Cayugas may not recover against subsequent bona-fide purchasers of parcels in the claim area. Thus, the parties debated whether the conveyances should be deemed void *ab initio,* or merely voidable, and whether the statutory restraints against alienation are fully and equally enforceable against all current occupiers of the claimed land.

The defense of the bona-fide purchaser is a serious question which is not squarely before the Court on these motions, because it involves cognizance of matters outside the pleadings. The Court has not been briefed on the question, and it appears not to have been explicitly de-

cided in prior decisions. *But see, Oneida v. County of Oneida,* 434 F.Supp. at 530 ("Although the present owners of the 100,000 acres may have acted in good faith when acquiring their property, such good faith will not render good a title otherwise not valid for failure to comply with the Nonintercourse Act.") *See also,* Comments, *supra,* 44 Albany L.Rev. 110, 131. The Court therefore declines to address issues of crucial importance to a defense not yet raised, where it is unnecessary for evaluating the defense that has been raised. It is sufficient, then, to hold that the absence of privity of contract does not bar plaintiffs from asserting their right of possession against current occupiers of the land.

*v. Gibson, supra,* 355 U.S. at 45–46, 78 S.Ct. at 101–02; *Oneida v. New York,* 520 F.Supp. at 1308. It is with these principles in mind that the Court turns to the following challenges to the legal sufficiency of the Cayuga's claim: the inapplicability of the Nonintercourse Act to preemption States; the unavailability of a private right of action under the Nonintercourse Act, or of a federal common law remedy; the abatement of plaintiff's statutory claims.

## X. APPLICABILITY OF THE NONINTERCOURSE ACT TO PREEMPTION STATES

It is the contention of the State defendants that the 1793 version of the Nonintercourse Act contained a change in language from its 1790 predecessor that reveals a Congressional intent to exclude New York State and other states with "preemptive rights" from its coverage.[10] The language of the 1790 Act, with the pertinent clause underscored, is as follows:

> . . . no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.

*Act of July 22, 1790,* ch. 33, 1 Stat. 137 § 4.

The 1793 version, which was operative at the time of the challenged 1795 conveyance, omits the underscored clause and reads as follows:

> . . . no purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution. . . .

*Act of March 1, 1793,* ch. 19, 1 Stat. 329 § 8. The same language appears in the 1802 version, which was in effect at the time of the challenged 1807 conveyance.

Conceding that the 1790 statute applied uniformly throughout the United States, defendants argue that the deletion of the preemptive rights clause in the 1793 version was a deliberate measure to permit the original states to acquire Indian lands without federal supervision. Support for this proposition is derived from *Seneca Nation of Indians v. Christie,* 126 N.Y. 122, 145, 27 N.E. 275 (1891) in which the New York Court of Appeals concluded that the omission "place[d] purchases of Indian lands within the states upon a different footing than other purchases," and from *United States v. Franklin,* 50 F.Supp. 152 (N.D.N.Y.1943) in which the district court found that "the omission is significant when viewed in the light of the practical construction given to the Act by both the State of New York and the United States." De-

---

**10.** An explanation of what is meant by "preemptive rights" appears in *Mohegan Tribe v. State of Connecticut, supra,* 638 F.2d at 616–17:

> In accordance with the "right of discovery" of the European settlers, native Indians found in this country were granted the "right of occupancy" to their lands. That is, the natives were allowed to remain upon their lands, but their freedom to alienate those lands was restricted. The land could be sold only to the European settlers or the governmental authority representing those settlers . . . Thus, while the Indians retained the "right of occupancy," the settlers retained the "fee interest" in the land and retained a "pre-emptive right" to purchase the land from the Indians. After the Revolution, this "pre-emptive right" lay in the individual

states—at least in the already settled part of the country. And when the states joined the Union, unless they ceded the lands, they retained their "pre-emptive rights." Nevertheless, the right to purchase Indian lands was not inconsistent with federal control over the extinguishment of Indian occupancy. Thus, the first Nonintercourse statute provided that even where the states retained "pre-emptive" rights to purchase the land, the federal government was responsible for overseeing any transfer of land from the Indians to the states.

See also, *Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823); *Oneida v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 776, 39 L.Ed.2d 73; *Oneida v. New York,* 520 F.Supp. at 1311.

fendants emphasize this last point, that contemporaneous and longterm construction confirms the non-applicability of the act to the original states, and they insist that it has not only been the state and federal governments, but the Cayugas themselves that have up to now proceeded on the assumption that the transactions were valid.

In determining the scope of a statute, the Court must first examine its language. *North Dakota v. United States,* —— U.S. ——, 103 S.Ct. 1095, 1102–03, 75 L.Ed.2d 77 (1983); *see, Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The language of the 1793 and 1802 Nonintercourse Acts reveals no ambiguity whatsoever as to their geographic scope. By their express terms both are applicable to land transactions "within the bounds of the United States," and area that has always included the State of New York. It is difficult to conceive why Congress would have employed this unequivocally inclusive language if it sought to exclude from coverage most of the territory formerly within the scope of the statute. If such was its intent, one would expect Congress to have simply changed the previous clause, "any state, whether having the right of pre-emption or not," to some variant of "any state, except those having the right of pre-emption." Instead, Congress omitted all reference to preemption states, apparently deeming any reference superfluous, and made the statute applicable "within the bounds of the United States." In our view, that change of language evidences, if anything, a legislative intent to remove all doubt as to the uniformly-inclusive nature of the nonalienability clause.

In *Mohegan Tribe v. State of Connecticut, supra,* 638 F.2d 612, the Second Circuit closely examined the geographical scope of the Nonintercourse Act, and concluded that "the statute was meant to apply to Indian Land throughout the United States." *Id.* at 620. The defendants in that case had argued that the statute did not apply to eastern states because of the "surrounded by settlements" exception which appeared in each of the Trade and Intercourse Acts from 1793 to 1834. That provision stated that:

> nothing in this act shall be construed to prevent any trade or intercourse with Indians living on lands surrounded by settlements of the citizens of the United States, and being within the jurisdiction of the individual states.

In determining whether this provision limited the geographical scope of the Nonintercourse Act, the court first noted, as we have, that the plain language of the act admits of no intra-national geographical limitations, and that the presence of geographical limitations in other sections of the Act "suggest[s] that Congress was careful to distinguish between regulations applicable only to Indian country and those applicable to all Indian tribes and their lands." *Id.* at 620.

Next, the Court examined the legislative and jurisdictional history of the Trade and Intercourse Acts, and found it consistent with "reading the Nonintercourse Statute, as its language suggests, to include encroachment upon Indian lands throughout the United States." *Id.* at 622. In reaching that conclusion the Court encountered the same argument advanced by the defendants here, that longstanding contemporaneous interpretation is indicative of the non-applicability of the statute to eastern states. It rejected that argument, stating:

> We believe that, although considerable evidence amassed by the State supports the proposition that the federal government did not avail itself of the provisions of the Nonintercourse statute and appeared to leave management of the affairs of the eastern tribes to the individual states, it does not follow that the federal government had no obligation to do so, or that the states had the authority—

unimpeded by the Acts—to buy land from the eastern tribes without federal approval.

*Id.* at 623.

The Court then surveyed the case law with respect to the geographic scope of the Nonintercourse Act, and concluded:

... the case law does not support the State's contention that we should ignore the plain language of the statute and limit the Nonintercourse statute's applicability. Moreover, while no case is controlling on the issue, *Oneida* [*v. County of Oneida*] does make clear that the extinguishment of all Indian title was meant to be a matter of federal concern. Since we have found no evidence that Congress intended to treat Indian lands in a different manner it would seem reasonable to believe that Congress intended a unified federal policy toward land acquisition from the Indians. In any event, we find nothing in the case law which dissuades us from our conclusion that Congress intended the Nonintercourse statute to apply throughout the United States.

*Id.,* 626. In a final section of the *Mohegan* decision, the "surrounded by settlements" exception was construed to apply only to those provisions of the Trade and Intercourse Act which regulated trade and intercourse, and not to the Nonintercourse Act, which governs conveyances of land.

The State defendants contend that *Mohegan* may be read only for its ultimate holding—that the "surrounded by settlements" exception does not limit the Nonintercourse Act—and thus does not preclude them from asserting other theories for excluding eastern states from coverage of the Act. In our view, however, it is improper to fixate on the ultimate holding in *Mohegan* and ignore almost the entire basis for that holding: the Court's finding that the statutory language, the legislative and jurisdictional history, and the case law all indicate that the Nonintercourse Act was meant to apply to land transactions throughout the United States.

Even if *Mohegan* were deemed distinguishable for not having addressed the spe-

cific geographic limitation asserted here, it may be noted that the district court which entertained the case upon remand did reach this precise question, and found no implied exclusion for preemption states. *Mohegan v. State of Connecticut,* 528 F.Supp. 1359, 1364 (D.Conn.1982). In so doing, Judge Blumenfeld observed that the 1793 revisers also deleted those words in the 1790 Act which had made it applicable "to any person or persons"; he noted that, under defendant's logic, the omission would be indicative of a Congressional intent to exclude "any person or persons" from the Act's restrictions—a patent absurdity. Instead, the Judge viewed the change of language as creating "a stronger prohibition, not a weaker one, because Congress omitted the earlier limitation on the class of prohibited grantees." *Id.* at 1364.

The cases relied upon by the state do not warrant a pronouncement that the Nonintercourse Act is inapplicable to preemption states. In *Seneca v. Christie, supra,* 126 N.Y. 122, 27 N.E. 275, (1891), the Court of Appeals did not hold the Nonintercourse Act inapplicable to New York State. It cited the change in language in support for its holding that a lesser degree of formalities would constitute federal approval of purchases in preemption states than elsewhere. After finding indicia of federal approval of the challenged treaty, including the presence of a United States Commissioner at its conclusion, the Court affirmed a directed verdict which had been issued below. Thus, even were this Court to adopt the construction employed in *Seneca* (which has arguably been undermined by the holding in *Mohegan*), it would not warrant dismissal of the complaint: plaintiffs have specifically alleged an absence of federal approval of the transactions now under scrutiny.

*United States v. Franklin County,* 50 F.Supp. 152 (N.D.N.Y.1943), however, is not distinguishable. The district court therein expressly concluded that the change of language "is indicative of an intent to exempt a state 'having the right of pre-emption' from the provisions thereof." *Id.* at 155. One basis for its conclusion was the long-

standing contemporaneous construction argument: that the sheer number of treaties concluded by the State without federal interference proves that the statute did not apply to New York State. But, as stated previously, the Second Circuit has not been impressed with that argument, *Mohegan*, 638 F.2d at 638, and neither is this Court. This is not a situation in which a statute has been consistently applied in a particular manner so as to suggest that the statute is properly construed in harmony with that application. Rather, the statute in question has evidently been largely disregarded by state and federal authorities for indeterminate reasons. As the district court in *Mohegan* aptly notes, the disregard of federal restraints on alienation "can[not] be said to have established the meaning of 25 U.S.C. § 177 and its predecessors." *Mohegan, supra,* 483 F.Supp. at 604.

The *Franklin* Court also based its decision on an overly broad reading of *Seneca v. Christie,* which, as discussed above, treated the Nonintercourse Act as applicable to preemption states. Finally, there is an incorrect intimation in *Franklin* that the federal government lacks authority to regulate the extinguishment of Indian title within the states; that in such matters, "the State has an exclusive right to deal." *Id.* at 156. That view is contrary to now clear principles of federal sovereignty over and responsibility for tribal lands, which were expressed by Justice White in *Oneida v. County of Oneida, supra:*

> The rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent apply in all of the States, including the original 13. It is true that the United States never held fee title to the Indian lands in the original States as it did to almost all the rest of the continental United States and that fee title to Indian lands in these States, or the pre-emptive right to purchase from the Indians, was in the State, *Fletcher v. Peck,* [ (10 U.S.) ] 6 Cranch 87, 3 L.Ed. 162 (1810). But this reality did not alter the doctrine that federal law, treaties, and statutes protected Indian occupancy and that its ter-

mination was exclusively the province of federal law.

414 U.S. at 670, 94 S.Ct. at 778.

Thus the decision in *United States v. Franklin County,* though in point, does not adequately substantiate its restrictive view of the geographic scope of the Nonintercourse act to commend its adoption here. In this regard, the Court joins company with *Mohegan, supra,* and with *Oneida v. County of Oneida,* 434 F.Supp. at 540, both of which rejected the holding of *Franklin* for substantially similar reasons.

Defendants have thus failed to convince the Court that the language in the Nonintercourse act making it applicable "within the bounds of the United States" was employed with intent to exclude the State of New York from its geographic scope.

## XI. PLAINTIFFS' RIGHT OF ACTION

In support of their motion to dismiss, the non-state defendants advance the novel argument that the Nonintercourse Act does not afford a private right of action. The argument begins with the proposition that none of the versions of the Nonintercourse Act have expressly provided that an Indian tribe or any other private party could sue to enforce its provisions or recover for statutory violations. It is therefore contended that, in order for the Cayugas to establish a right to sue to recover for injuries sustained as a result of an alleged violation of the Act, they must first show that the action meets the criteria set forth in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) for determining whether a private remedy is implicit in a statute not expressly providing one. The criteria are as follows:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," . . . Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegat-

ed to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (emphasis in original).

Defendants correctly consider the intent of the enacting Congress to be the key inquiry in such analysis, *Transamerica Mortgage Advisors Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979). They contend that there is no indication in the language of the successive acts, or in the legislative history of those acts, of a legislative intent to create a private right of action. They find evidence of a contrary intent in the fact that Congress provided various enforcement provisions and penalties in the 1793 Act and subsequent Acts, other than a private right of action for possession or damages; it thereby revealed that, "when Congress wished to provide a . . . remedy, it knew how to do so and did so expressly." *Touche Rose & Co. v. Redington,* 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82.

Particular significance is attached to provisions in the 1793 Act which empowered the President to remove persons settling on Indian lands, and which made the purchase of Indian lands in violation of the non-alienability provisions a misdemeanor punishable by a fine not exceeding $1,000 and up to twelve month's imprisonment. This, in defendant's view, evidences a legislative intent not to create other remedies, such as a private right of action.

Defendants add that it is particularly unlikely for the enactors to have intended that a right of action be available to an Indian tribe, since until the late eighteenth century it was doubtful that Indian tribes could sue in federal court, absent special legislation.

Finally, a variety of excerpts from historical and legal sources are produced by the defendants in an effort to establish that the Nonintercourse Act was not enacted for the purpose of protecting Indians, but rather to maintain peace and order on the frontier. In this view, Congress was concerned with the alienation of Indian land only insofar as it engendered a risk of Indian wars or other retaliatory acts against non-Indians. Since the act was meant to benefit the public at large, and since the enforcement provisions and penalties set forth in the Act were ample to effectuate such purpose, defendants conclude that the implication of a private remedy would be inappropriate.

The defendants' argument is elaborate and well-researched, but unpersuasive for a number of reasons.

A. *The Complaint Asserts a Current Right to Possession Conferred by Federal Law Without Reliance on an Implied Right of Action Under the Nonintercourse Act*

1. *The Characterization of the Claim in Oneida v. County of Oneida.*

The Supreme Court decision in *Oneida v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) did not address the implied right of action question now before this Court, but its analysis of the jurisdictional basis of a similar claim establishes that such claims are not strictly "based on," "arising under," or "implied from" the Nonintercourse Act. As noted in the previous discussion on jurisdiction, the claim in *Oneida* was virtually identical to the claim at bar, save the size and location of the disputed tract. Like the Cayugas, the Oneida tribe alleged that their right of possession had been confirmed by federal treaty, and was subject to the restraint against alienation in the Nonintercourse Act. They also alleged dispossession through conveyances to the State of New York.

The district court and the Court of Appeals read the complaint in *Oneida* as stating a claim, under state law, to establish a right to the possession of real property, *Oneida v. County of Oneida,* 70–CV–35 (N.D.N.Y. Nov. 9, 1971), *aff'd,* 464 F.2d 916 (2d Cir.1972) (Friendly, C.J.); the higher court specifying that the suit constituted an action in ejectment. 464 F.2d at 920. Both courts reached the conclusion that there was no federal question jurisdiction under

28 U.S.C. § 1331 or § 1362 since (1) the mere allegation of a federal source of title does not convert an ordinary action for possession into a federal case; and (2) the allegation that the conveyance to the state violated the Nonintercourse Act is not a necessary element of a well-pleaded complaint in a possessory action, because it is alleged in anticipation of and to avoid a defense of a valid conveyance.

The Supreme Court accepted the premise shared below that "the case was essentially a possessory action," *id.* at 666, but rejected the conclusion that the action presented no federal question. Federal jurisdiction was implicated in that "the right to possession itself is claimed to arise under federal law in the first instance." *Id.* at 676. The Court distinguished other suits for possession claiming title under a federal statute, patent, or treaty which were found devoid of the requisite federal question, *e.g., Taylor v. Anderson,* 234 U.S. 74, 34 S.Ct. 724, 58 L.Ed. 1218 (1914), on the grounds that such suits were by individuals; tribal suits were deemed on a different footing. But the crucial point here is that the Court considered the Indian's claim as a traditional possessory claim which could be maintained in federal court because of the "nature and source" of tribal rights in land:

> Given the nature and source of the possessory rights of Indian tribes to their aboriginal lands, particularly when confirmed by treaty, it is plain that the complaint asserted a controversy arising under the Constitution, laws, or treaties within the meaning of both § 1331 and § 1362.

*Id.* at 667.

This is not to say that the allegation that plaintiff's title had been extinguished in violation of the Nonintercourse Act was irrelevant for the purpose of determining jurisdiction. Indeed, the Court emphasized that:

> the assertion of a federal controversy does not rest *solely* on the claim of a right to possession derived from a federal grant of title ... Rather, it rests on the not insubstantial claim that federal law

now protects, and has continuously protected from the time of the formation of the United States, possessory rights to tribal lands ....

*Id.* at 782 (emphasis added).

At one point, the Court even acknowledged that the Oneida's complaint, in part, "asserts a claim under the Non-Intercourse Acts." *Id.* at 678. But the thrust of that same paragraph, as well as of the opinion as a whole, is that the Oneidas were asserting a possessory right based primarily on the unique source and nature of their tribal property interest. The alleged violation of the Nonintercourse Act, though an inevitable and key issue in *Oneida,* and here as well, is not necessarily regarded as the source or basis of the claim.

The concurring opinion of Justice Rehnquist, joined by Justice Powell, confirms this reading of the *Oneida* decision. Near the outset of his opinion, Justice Rehnquist acknowledges and approves the majority's characterization of the action:

> As the majority seems willing to accept, the complaint in this action is basically one in ejectment. Plaintiffs are out of possession; the defendants are in possession, allegedly wrongfully; and the plaintiffs claim damages because of the allegedly wrongful possession. These allegations appear to meet the pleading requirements for an ejectment action as stated in *Taylor v. Anderson,* 234 U.S. 74, 34 S.Ct. 724, 58 L.Ed. 1218 (1914). Thus the complaint must be judged according to the rules applicable to such cases.

*Id.* at 683.

Justice Rehnquist then reasoned, much as the majority did, that the peculiar source of the Indians' interest, coupled with the federal government's "continuing solicitude for the rights of Indians in their land," *id.* at 683, created federal court jurisdiction over what might otherwise be a state law suit in ejectment.

The *Oneida* decision and its concurrence make it clear that the complaint before this Court presents a possessory claim, "basically in ejectment," with federal juris-

diction based on the source, nature, and continuing federal interest in the contested possessory right. *See also, Mohegan Tribe v. State of Connecticut,* 638 F.2d at 625. Viewed as such, there is simply no need to determine whether a parallel claim for the same relief might be asserted on the theory that a private right of action is implicitly afforded by the Nonintercourse Act.[11]

### 2. *Availability of a Common Law Cause of Action*

Defendants dispute the Cayuga's right to assert a possessory claim without statutory authorization for the cause of action. They rely largely upon *Milwaukee v. Illinois,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) for the general proposition that federal common law remedies are disfavored, and for the view that any such remedies previously available have been preempted by the Trade and Intercourse Acts.

Turning first to the more general limitations on federal common law remedies, defendants cite the following familiar principle:

Federal courts, unlike state courts, are not general common law courts and do not possess a general power to develop and apply their own rules of decision ... The enactment of a federal rule in an area of national concern ... is generally made not by the federal judiciary, purposely insulated from democratic pres-

sures, but by the people through their elected representatives in Congress.

*Id.* at 312–13, 101 S.Ct. at 1790 (citations omitted).

The question presented in *Milwaukee* was whether the respondent states of Illinois and Michigan could invoke federal common law principles of nuisance to require stricter effluent limitations than those imposed by the Water Pollution Control Act Amendments of 1972. Starting from the assumption that "it is for Congress, not the federal courts to articulate the appropriate standards to be applied as a matter of federal law," *id.* at 317, 101 S.Ct. at 1792, the Court held that the federal judiciary lacked authority to enforce more stringent limitations than those provided by Congress.

■ Nothing in *Milwaukee* inhibits this Court from permitting the Cayugas to sue to establish a right to possess property. The plaintiffs are not asking the Court to create substantive law of the type which concerned the Court in *Milwaukee*. Instead, plaintiffs point to specific treaties which define the scope of their substantive right to possession, and the construction of those sources—not federal common law— will determine the validity of their claim. Federal common law is invoked at this point only as a source for the right of action, only for the proposition that an Indian possessory action may be asserted in a court of proper jurisdiction without express

---

11. Plaintiffs inform the Court that during the district court proceedings in *Oneida v. County of Oneida* upon remand, Judge Port offered the following comment from the bench:

The principle thrust of the [defendants'] argument is a reassertion of the non-justiciability and the lack of an implied cause-of-action arguments. These were raised earlier. I have ruled adversely to the defendants. Those arguments did not, in my opinion, support a dismissal for failure to state a claim after a trial. They do not support a denial of damages. I think what's been missed here, when you talk about implied causes of action under the Non-Intercourse Act, is that it is not necessary to seek out an implied cause of action. The old common law action of trespass will do very well. Why be inventive? You're going to invent the wheel all over again.

*Transcript* at 19 (October 5, 1981).

Defendants vigorously argue that the above-quoted comments were unsolicited and unwarranted; that the implied right-of-action argument had been tangentially raised by the *Oneida* defendants in a memo prior to trial on the liability issue, but had then been dismissed by the Court as outside the scope of its pre-trial order. Consequently, when the remarks were made after trial, the issue was no longer present in the case.

Accepting defendants' account of the *Oneida* proceeding, it would indeed be improper to accord *stare decisis* status to Judge Port's conclusion. However, this Court has reached a similar conclusion after independently considering the question. The quote is reproduced here merely as a concise and intuitive statement close to our own view of the issue.

statutory authorization. That principle is well-established.

"Indian lands claims have traditionally been asserted in the courts of this country for resolution." *Oneida v. New York,* 691 F.2d at 1081. In *Oneida v. Oneida County,* the Supreme Court remarked upon the "almost countless cases" in which the possessory rights of Indian tribes have been adjudicated, and listed many of them. 414 U.S. at 669 n. 5, 94 S.Ct. at 778 n. 5. During the long history of adjudications involving the conveyability of Indian land, rarely have courts noted their reliance upon any statutory basis for the cause of action. *See, e.g., Meigs v. McClung's Lessee,* 13 U.S. (9 Cranch) 11, 3 L.Ed. 639 (1815); *Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 542, 5 L.Ed. 681 (1823); *Patterson v. Jenks,* 27 U.S. (2 Pet.) 216, 7 L.Ed. 402 (1829). It appears to have been simply assumed that title to land necessarily included the ability to assert ownership rights in a court of proper jurisdiction, for "[h]ow can it be said to be any title at all which cannot be asserted in a court of justice by the owner to defend or obtain possession?" *Green v. Biddle,* 21 U.S. (8 Wheat.) 1, 11, 5 L.Ed. 547 (1823) (Story, J.). *See also, id.* at 32 (Washington, J.) (at common law, "right to land ... includes the right ... to recover the possession by suit"). Accordingly, the Supreme Court could confidently state in *Marsh v. Brooks,* 49 U.S. (8 How.) 223, 232, 12 L.Ed. 1056 (1850), "[t]hat an action of ejectment could be maintained on an Indian right of occupancy and use, is not open to question." *See also,* F. Cohen, *Handbook of Federal Indian Law* (1982 ed.) 523 ("The right to protection of tribal possession through actions of ejectment, trespass, or other similar possessory suits was affirmed early in the nation's history").

 To be sure, there is an unfortunate lack of specificity in early federal court cases involving Indian possessory rights as to the governing sphere—state or federal—which provided the right of action. *See generally,* A. Hill, The Law Making Power of the Federal Courts: Constitutional Preemption, 67 *Colum.L.Rev.* 1024, 1028, 1069

(noting that such lack of specificity was endemic in the pre-Erie era). Nevertheless, it has long been clear that "Indian title is a matter of federal law," *Oneida v. Oneida County,* 414 U.S. at 670, 94 S.Ct. at 778; *United States v. Santa Fe Pacific R. Co.,* 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941), and, properly viewed, it is federal common law that has implicitly supplied the right of action in federal possessory actions. *C.f., Oneida v. Oneida County,* 414 U.S. at 674, 94 S.Ct. at 780 ("absent federal statutory guidance, the governing rule of decision [for a tribal ejectment action] would be fashioned by the federal court in the mode of the common law."). *See also, United States v. Forness,* 125 F.2d 928 (2d Cir.), *cert. denied, sub. nom. City of Salamanca v. United States,* 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942).

The Supreme Court decision in *Milwaukee v. Illinois, supra,* does not purport to disable federal courts from continuing their traditional reliance upon federal common law for such interstitial purposes, 451 U.S. at 324–25 n. 18, 101 S.Ct. at 1796 n. 18, and it certainly does not address itself to the unique exigencies of tribal land claims. The Court, therefore, declines defendants' invitation to place a new impediment in the way of such claims, by requiring a statutory basis for a cause of action heretofore freely available.

### 3. Preemption of the Common Law Right of Action

 Nor does the Court accept defendants' contention that Congress preempted any common law right of action to enforce tribal possessory rights by enacting the Trade and Intercourse Acts. The question of whether a federal statute preempts an existing federal common law remedy is distinct from the question of whether a statute implies a private right of action, but Congressional intent and the comprehensiveness of the statute are key elements in either determination. *See, Middlesex County Sewage Authority v. National Sea Clammers Assn.,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (Federal Water Pollution

Control Act and Marine Protection & Sanctuaries Act do not provide an implied right of action, and preempt the federal common law of nuisance). The case primarily relied upon the defendants, *Milwaukee, supra,* established that the enactment of a comprehensive statute which has "addressed the problem" or "occupies the field" indicates a congressional intent to supplant parallel common law remedies. As mentioned previously, *Milwaukee* involved construction of the Federal Water Pollution Control Act, "a comprehensive regulatory program supervised by an expert administrative agency." *Id.* 451 U.S. at 317, 101 S.Ct. at 1792. The Court discerned from that statute a Congressional intent to preclude the judicial imposition of more stringent effluent limitations through the application of federal common-law principles.

The Trade and Intercourse Act neither created a "comprehensive regulatory program" with respect to tribal possessory rights, nor "addressed the problem" in the sense that the FWPCA did in the water pollution field. As described in *Mohegan Tribe v. State of Connecticut,* 638 F.2d 612, 616 (2d Cir.1980), "the majority of sections of the original Act established a system of licensing fur trade with the Indians and imposed federal authority over crimes committed on Indian property." Though the Act became more elaborate in subsequent re-enactments, the pattern remained the same: trade and intercourse were the focus of most sections; possessory rights were substantially confined to the single Nonintercourse Act section. That section, too, became more elaborate, setting forth penalties and punishments for violators. The 1793 version, for example, made violation a misdemeanor punishable by up to $1,000 fine and twelve month's imprisonment. The addition of this penal clause, however, does not transform the Trade and Intercourse Acts into the type of comprehensive

legislation which has been found to displace pre-existing common law remedies. *See, e.g., National Sea Clammers, supra* (FWPCA and Marine Protection and Sanctuaries Act preempt common law nuisance remedies); *Amoco Oil Co. v. Local 99, Int'l Bro. of Elec. Wkrs.,* 536 F.Supp. 1203 (D.R. I.1982) (NLRA preempts common law remedies for tortious interference with a labor contract); *United States v. Kin-Buc, Inc.,* 532 F.Supp. 699 (D.N.J.1982) (Clean Air Act preempts common law nuisance remedies); *United States v. Price,* 523 F.Supp. 1055 (D.R.I.1981) (Resource Conservation and Recovery Act and Comprehensive Environmental Response, Compensation, and Liability Act preempt federal common law nuisance remedies).

The more crucial question, however, is whether Congress has "addressed the problem" for which the plaintiffs are invoking a common law remedy. In this instance it has not. Nothing in the Trade and Intercourse Acts touches upon the traditional mechanisms for the enforcement of possessory rights. While it is true that matters beyond those specifically addressed by a comprehensive statute may be displaced by implication, *Illinois v. Outboard Motor Corp.,* 680 F.2d 473 (7th Cir.1982) there must be an ample basis for discerning such an expansive preemptive effect. In this instance, the Court finds no basis for the notion that a statute which explicitly invalidates title held by some, implicitly preempts the right of others to assert their own possessory rights. The Nonintercourse Act has never been deemed to emit such preemptive emanations; we decline to announce their discovery here.[12]

B. *The Right of Action of the United States may be invoked by a Tribal Trust-Beneficiary*

As discussed above, the Court has concluded that the Cayugas may, as a matter

---

12. Although the question of whether a federal statute preempts a state statute involves somewhat different considerations than those raised by a question of preemption of federal common law, *Milwaukee, supra,* 451 U.S. at 316, 101 S.Ct. at 1792, it is instructive to note that the

Nonintercourse Act was found not to have preempted additional remedies provided in a parallel state restraint against alienation of Indian lands. *New York ex rel. Cutter v. Dibble,* 62 U.S. (21 How.) 366, 16 L.Ed. 149 (1859).

of federal common law, assert a claim to recover possession of tribal lands. In this section, the Court notes an alternative basis for the tribal right of action, which still does not necessitate the inference of a private right of action under the Nonintercourse Act.

 It is well established that the United States may, as trustee on behalf of an Indian tribe, bring suit to enforce tribal possessory rights protected by the Nonintercourse Act and other federal laws. *See, e.g., United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941); *United States v. Candelaria,* 271 U.S. 432, 46 S.Ct. 561, 70 L.Ed. 1023 (1926); *Cramer v. United States,* 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923); *Heckman v. United States,* 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1911); *United States v. Ahtanum Irrigation District,* 236 F.2d 321 (9th Cir.1956); *United States v. Forness,* 125 F.2d 928 (2d Cir.1942); *United States v. 7,405.3 Acres of Land,* 97 F.2d 417 (4th Cir.1938); *United States v. Boylan,* 256 F. 165 (2d Cir.1920); *United States v. Franklin County,* 50 F.Supp. 152 (N.D.N.Y.1943).[13] And, as noted previously, it is also established that the purpose and effect of 28 U.S.C. § 1362 was "to open the federal courts to the kinds of claims that could have been brought by the United States as trustee, but for whatever reason were not so brought." *Moe v. Consolidated Salish & Kootemai Tribes,* 425 U.S. 463, 472, 96 S.Ct. 1634, 1641, 48 L.Ed.2d 96 (1976). *See, Oneida v. New York, supra,* 691 F.2d at 1080, 1084. The measure was meant to assure the tribes "of the same judicial determination whether the action is brought in their behalf by the Government or by their own attorneys." H.R.Rep. No. 2040, 89th Cong., 2d Sess., 2–3, *reprinted in* 1966 U.S.Code Cong. & Ad.News 3145, 3147. *See, Oneida v. New York, supra,* 691 F.2d at 1080; *Narragansett Tribe of Indians v. So. R.I. Land Devel. Corp., supra,* 418 F.Supp. 798, 806 (D.R.I.1976).

 The United States could have brought this suit, but has, according to the parties, declined to do so. The Cayugas are therefore to be afforded an opportunity to do so on their own behalf. In short, the right of action owned by the United States to enforce the Nonintercourse Act may, due to 28 U.S.C. § 1362, be invoked by the affected Indian tribe. The Cayugas are exercising that derivative right of action in bringing this lawsuit.

## C. A Private Right of Action is Implicit in the Nonintercourse Act

 Assuming plaintiffs could not raise their claims except by a private right of action implicit in the Nonintercourse Act, there is sufficient basis for finding that such implied right of action exists.

In *Merrill Lynch Pierce Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), the most recent Supreme Court decision on the implication of private remedies, the Court offered an historical overview of the changing judicial approaches to that recurrent problem. Speaking through Justice Stevens, the Court explained:

> Our approach to the task of determining whether Congress intended to authorize a private cause of action has changed significantly, much as the quality and quantity of federal legislation has changed. When federal statutes were less comprehensive the Court applied a relatively simple test to determine the availability of a private remedy. If the statute was enacted for the benefit of a special class, the judiciary normally recognized a remedy for members of that class. *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916).

*Id.,* 456 U.S. at 374, 102 S.Ct. at 1837.

The principle of *Rigsby,* that a statutory violation gives rise to a cause of action for damages "to one of the class for whose especial benefit the statute was enacted,"

---

**13.** Indeed, the failure of the United States to bring such action may, in certain circumstances, constitute an actionable breach of fiduciary duty. *United States v. Oneida Nation of New York,* 201 Ct.Cl. 546, 477 F.2d 939 (1973).

241 U.S. at 39, was the prevailing approach throughout most of our history. *Merrill Lynch, supra* at 374, 102 S.Ct. at 1837. The approach was considered to be "but an application of the maxim, *Ubi jus ibi remedium*", where there is a right, there is a remedy. *Rigsby, supra,* 241 U.S. at 39, 36 S.Ct. at 484. *See also, Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (" '[I]t is a general and indisputable rule, that where there is a legal right, there is also a remedy by suit, or action at law, whenever that right is invaded.' ", *quoting,* 3 W. Blackstone, *Commentaries* 23); *Merrill Lynch, supra* at 375 n. 54, 102 S.Ct. at 1837 n. 54. The Court in *Merrill Lynch* further noted that, "while the Rigsby approach prevailed ... congressional silence or ambiguity was an insufficient reason for the denial of a remedy", *id.* at 377, 102 S.Ct. at 1838, and that federal courts traditionally "regarded the denial of a remedy as the exception rather than the rule." *Id.* at 375, 102 S.Ct. at 1838.

■ In the 1975 decision, *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26, the Court announced a more exacting set of criteria for determining whether a private right of action is implicit in a statute not expressly providing one. Although *Cort v. Ash* lists four factors to consider in making the determination, reproduced *infra,* it has become clear that the central inquiry under the new approach is "whether Congress intended to create the private remedy asserted." *Transamerica Mortgage Advisors Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Middlesex Cty. Sewage Auth. v. Nat. Sea Clammers Ass'n.,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981). In *Merrill Lynch, supra,* 456 U.S. at 377, 102 S.Ct. at 1839, the Court attributed its new restrictive attitude to "the increased complexity of federal legislation and the increased volume of federal litigation...."

■ Despite the fact that the new restrictive approach to inferring private rights of action was devised in response to problems inherent in modern legislation, defendants assume that such approach must be employed in the analysis of a statute which has remained substantially the same since 1793. In light of *Merrill Lynch,* however, that assumption must be discarded. As the Court stated:

In determining whether a private cause of action is implicit in a federal statutory scheme when the statute by its own terms is silent on the issue, the initial focus must be on the state of the law at the time the legislation was enacted.

456 U.S. at 378, 102 S.Ct. at 1838. *See also, Cannon v. University of Chicago,* 441 U.S. 677, 698–99, 99 S.Ct. 1946, 1958, 60 L.Ed.2d 560; *Mohegan v. State of Connecticut, supra,* 638 F.2d 612, 621 (Indian legislation "cannot be interpreted in isolation but must be read in light of the common notions of the day and the assumptions of those who drafted them," *quoting, Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 206, 98 S.Ct. 1011, 1019, 55 L.Ed.2d 209 (1978)).

As noted above, the Nonintercourse Act was enacted during a period in which federal courts, "following the common law tradition," regularly inferred private rights of action from statutes not expressly providing them. *Merrill Lynch, supra* 456 U.S. at 375, 102 S.Ct. at 1838. *See also,* T. Frankel, Implied Rights of Action, 67 *Va.L.Rev.* 553, 555. It must be presumed that Congress was aware of this judicial proclivity when it acted. *Cf., Merrill Lynch, supra* at 382 n. 66, 102 S.Ct. at 1841 n. 66 ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute...."). Accordingly, it is anachronistic to regard the absence of an express right of action in this 18th Century legislation as indicative of a lack of legislative intent to allow such an action. Indeed, to require the Court to locate an affirmative expression of congressional intent before permitting a private action under a statute of this era would be more likely to defeat actual Congressional intent than to effectuate it.

This is, of course, not to say that *Merrill Lynch* requires federal courts to infer private rights of action freely from statutes enacted before *Cort v. Ash* and sparingly from those enacted thereafter. *Cort v. Ash*

itself involved the construction of a measure which had been enacted in 1907: 18 U.S.C. § 610, which prohibited campaign contributions or expenditures by national banks, corporations, and labor organizations. But that measure was nevertheless part of a modern and comprehensive statutory scheme, for which the criteria employed by the Court in its decision were well-suited. In subsequent cases in which the implied right of action issue was considered, the legislation was of a similar nature. *See, e.g., Merrill Lynch, supra* (Commodity Exchange Act amendments of 1973); *Middlesex Cty. Sewage Auth. v. Nat. Sea Clammers Ass'n., supra* (Federal Water Pollution Control Act of 1972); *Touche Ross & Co. v. Reddington, supra* (Securities Exchange Act of 1934); *Cannon v. University of Chicago, supra* (Title IX of Education Amendments of 1972). The problem with applying the *Cort v. Ash* criteria to the Nonintercourse Act is not, therefore, that the statute predates the decision. It is, rather, that the criteria were devised as a means to ascertain congressional intent with respect to complex legislation enacted in a modern jurisprudential context. If those criteria are formalistically applied to the antique measure now under scrutiny, it is most doubtful that an accurate portrayal of congressional intent will emerge.

Accordingly, the determination of whether a private right of action exists under the Nonintercourse Act will be made by applying the implication principles accepted by Congress and the Courts of the enactment era: the *Rigsby* approach. The Cayugas, then, may infer a private right of action under the Act provided their tribe is "one of the class for whose especial benefit the statute was enacted...." *Rigsby, supra* at 39, 36 S.Ct. at 484.

There can no longer be any doubt but that Indian tribes are especial beneficiaries of the Nonintercourse Act. In *Joint Tribal Council of the Passamaquoddy Tribe v. Morton, supra,* 388 F.Supp. 649 (D.Me. 1975), Judge Gignoux thoroughly examined the extensive case law on the purpose of the Act, and was able to conclude that:

[e]very court ... which has considered the purpose of the [Nonintercourse] Act has agreed that the intent of Congress was to protect the lands of the Indian tribes in order to prevent fraud and unfairness.

*Id.* at 656. Most notable among the many cases cited therein is *Federal Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960), in which the Supreme Court declared:

The obvious purpose of that [Nonintercourse Act] is to prevent the unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties ....

*Id.* at 119, 80 S.Ct. at 555. Judge Gignoux' further research on the subject is worth reproducing, as it indicates the extent of the judicial consensus on the statutory purpose:

The decided cases are replete with similar statements of the Act's purpose. *E.g., United States v. Candelaria,* 271 U.S. 432, 441–42 [46 S.Ct. 561, 562–63, 70 L.Ed. 1023] ... (1926) (the intent of Congress was "to prevent the Government's Indian wards from improvidently disposing of their lands and becoming homeless public charges," ...; *Tuscarora Nation of Indians v. Power Authority,* 257 F.2d 885, 888 (2d Cir.1958) ... (the statute was enacted "to prevent Indians from being victimized by artful scoundrels inclined to make a sharp bargain"); *Alonzo v. United States,* 249 F.2d 189, 196 (10th Cir.1957) ... (the purpose of such legislation is to protect the Indians "against the loss of their lands by improvident disposition or through overreaching by members of other races"); *Seneca Nation of Indians v. United States,* 173 Ct.Cl. 917, 923 (1965) ("From the beginning, this legislation has been interpreted as giving the Federal Government a supervisory role over conveyances by Indians to others, in order to forestall fraud and unfairness.")

*Id.,* 388 F.Supp. at 656–57.

Cases since the district court decision in *Passamaquoddy* have adhered to the rather self-evident proposition that the Noninter-

course Act was intended to protect Indians. *E.g., Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 377 (1st Cir.1975) ("to prevent to unfair, improvident, or improper disposition of Indian lands"); *Oneida v. County of Oneida,* 434 F.Supp. 527, 538 ("to protect the Oneida nation"); *Schaghticoke Tribe of Indians v. Kent School Corp., Inc.,* 423 F.Supp. 780, 784 (D.Conn.1976) ("to protect the Indians from their own improvidence and to prevent the unfair or improper disposition of Indian lands"); *Narragansett Tribe v. So. R.I. Land Devel. Corp.,* 418 F.Supp. 798, 803 (D.R.I.1976) (" 'to prevent the government's Indian wards from improvidently disposing of their lands and becoming homeless public charges' ").[14]

■ Notwithstanding this judicial consensus, defendants urge this Court to re-examine the historical background of the Nonintercourse Act and declare that its purpose was to promote peace on the frontier for the benefit of the public at large, and that it was not meant to benefit any special class in particular. A major source of support for their thesis is an address made in 1791 by President George Washington, in which he discussed the objectives of the statute:

> Among the most important of these [objectives] is the defense and security of the western frontiers. To accomplish it on the most humane principles was a primary wish.
> Accordingly . . . effectual measures have been adopted to make those of a hostile description sensible . . .
> It is sincerely to be desired that all need of coercion in the future may cease; and that an intimate intercourse may succeed . . .
> In order to do this, it seems necessary . . . [t]hat the mode of alienating their lands, the main source of discontent and war, should be defined and regulated as to obviate imposition.

American State Papers: *Foreign Relations* 16.

The thesis advanced by the defendants does, at least in part, explain the purpose for granting protection to the Indians. Indeed, the Second Circuit has recognized as much in *Mohegan Tribe v. State of Connecticut,* 638 F.2d 612 (1981). The defendants in that case had argued that, since the purpose of the Nonintercourse Act was to promote peace on the frontier and not to protect Indian tribes, the Act should be construed to cover only land in "Indian Country", and not the Connecticut lands in issue. After considering many of the same primary and secondary sources that have been cited by the defendants here, the Court acknowledged,

> Of course, Washington and Knox and their countrymen were concerned not only with protecting the Indians, but with preventing the onset of overt hostilities. Moreover, it is true that peace along the frontier, and in particular the prevention of encroachment by non-Indian settlers on Indian lands along the frontiers, were primary objects of the Act's land provisions.

*Id.* at 622. However, the Court ultimately rejected the proposed geographic limitation on the scope of the Act, due to its conclusion that,

> there is no evidence demonstrating that peace on the frontier and enforcement of treaty obligations were the *sole* purposes of the various Acts.

*Id.* at 622 (emphasis in original).

The important point for consideration here is that the *Mohegan* decision does not in any way contest the longstanding view that the Nonintercourse Act was enacted for the protection of Indians. It limited itself to discussing "the State's argument . . . on the motivation for granting federal protection for Indians," *id.,* at 621, and found that a governmental concern for

---

**14.** To be sure, the purpose of the Nonintercourse Act as stated in the cited cases may today be criticized for its paternalistic assumptions. *See,* F. Cohen, *supra* at 509 (noting this, but describing less paternalistic functions the Act continues to serve). However, the Court's duty here is to identify the Act's purpose, not to critique it.

peace on the frontier was a factor in the determination to protect Indians.

There is no inconsistency in finding that a statute was enacted for the benefit of a special class, and that it serves a broader public interest as well. In *Merrill Lynch, supra,* for example, the Supreme Court found that the Commodities Exchange Act, 7 U.S.C. § 4b, was enacted for the especial benefit of investors in futures contracts, and could be invoked by such persons in private actions for damages. In so holding, the Court explained:

> The legislative history quite clearly indicates that Congress intended to protect all futures traders from price manipulation and other fraudulent conduct violative of the statute. It is assumed, of course, that federal regulation of futures trading benefits the entire economy; a sound futures market tends to reduce retail prices of the underlying commodities ... Although the speculator has never been the favorite of Congress, Congress recognized his crucial role in an effective and orderly futures market and intended him to be protected as much as the hedger.

*Id.,* 456 U.S. at 390, 102 S.Ct. at 1845. The Nonintercourse Act was similar in conception, and the ability of the defendants to identify a governmental policy of promoting peace on the frontier does not negate the longstanding consensus that the instrument of that policy was a statute for the benefit of Indians in particular.

The defendants also argue that the original policy of the federal government was not to protect Indian possessory rights, but was rather to promote Indian withdrawal and the advancement of white settlement. In this view, the function of the Nonintercourse Act was to afford federal control over dispossession, in order that "this process should be as free of disorder and injustice as possible." F. Prucha, *American Indian Policy in the Formative Years: The Indian Trade and Intercourse Acts, 1790–1832* 186 (1962). The defendants thus regard it as historically inaccurate to characterize the Nonintercourse Act as a measure

for the special protection of Indians, and they insist that a private right of action would disserve the Act's true function.

The defendants' thesis may well be accurate as history, *see, e.g., Mohegan, supra* at 622 ("... the evidence rather convincingly demonstrates that the nation's early leaders were perhaps not so charitable toward the Indian as we have come to view them"), but it must not be a basis for discerning law. Whether or not the federal government anticipated or even desired the alienation of Indian lands, it nevertheless committed itself to a system of treaties, agreements, and statutes which gave rise to a trust relationship between the government and the tribes. *See, Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831); *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886). The United States has thereby "charged itself with moral obligations of the highest responsibility and trust" with respect to its management of Indian affairs. *Seminole Nation v. United States,* 316 U.S. 286, 296–97, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942). The Nonintercourse Act in particular is firmly understood to have "impose[d] upon the federal government a fiduciary role with respect to protection of the lands of a tribe covered by the Act ..." *Passamaquoddy, supra,* 528 F.2d at 379. *See also, United States v. Oneida Nation of New York,* 201 Ct.Cl. 546, 477 F.2d 939 (1973); *Seneca Indians v. United States,* 173 Ct.Cl. 917, 923 (1963); *United States v. Sante Fe R. Co.,* 314 U.S. 339, 348, 62 S.Ct. 248, 252, 86 L.Ed. 260 (1941).

In effect, the defendants are asking the Court to look beyond the face of unequivocal legal commitments made to Indian tribes, and give effect to ulterior policy considerations which may have induced, in part, those commitments. The Court is loathe to take that path. No matter how thoroughly a *de facto* policy of Indian removal may be established, the *de jure* policy of this government from its very beginning has been to respect and protect Indian possessory rights. *Cramer v. United States, supra,* 261 U.S. at 227, 43 S.Ct. at 344; *see,*

*Worcester v. Georgia, supra.* It is that *de jure* policy which the Court must consider in determining the issues raised by this lawsuit.

In a related argument, defendants maintain that the Nonintercourse Act was enacted in an era when Indian tribes generally lacked capacity to bring suit in federal court; that Congress therefore could not have intended that Act to bestow upon tribes a private right of action.

The historical accuracy of defendant's premise is debatable. Certainly during the nation's early history lawsuits by tribes were rare, but as scholars of the subject have explained:

> Except for the Cherokee, who had experienced some intermarriage and infusion of Anglo-American legal concepts, the tribes were ignorant of American legal processes and were still politically organized in traditional fashions, making resort to American courts virtually impossible.

Clinton & Hotopp, Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims, 31 *Me.L.Rev.* 17, 46 (1978). It is also likely that the Supreme Court's decision in *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), which held that the Cherokee tribe was not a foreign state for the purpose of invoking the original jurisdiction of the Supreme Court, "had a chilling effect that discouraged tribes from bringing suit." Clinton & Hotopp, *supra* at 46. The Court did not, however, unequivocally declare a general tribal incapacity to sue. It is simply not clear, then, whether the scarcity of tribal suits in the 18th and early 19th centuries should be attributed to legal barriers, or rather to restraints that were political and cultural in nature.

In either case, the present right of the Cayugas to invoke the Nonintercourse Act does not turn on whether their ancestors had or lacked access to the federal courts. The crucial aspect of our inquiry under *Rigsby* is firmly established: the Act was enacted for the especial benefit of Indians. Whatever impediments may have prevented plaintiffs' ancestors from bringing suit

were extraneous to the purpose of the Nonintercourse Act, and have long since disappeared. Indians are now "entitled 'to take their place as independent qualified members of the modern body politic' ", and their "participation in litigation crucial to their welfare should not be discouraged." *Arizona v. California,* —— U.S. ——, ——, 103 S.Ct. 1382, 1389, 75 L.Ed.2d 318 (1983), *quoting Poafpybitty v. Skelly Oil Co.,* 390 U.S. 365, 369, 88 S.Ct. 982, 984, 19 L.Ed.2d 1238 (1968), *in turn quoting Bd. of Cty. Comm'rs. v. Seber,* 318 U.S. 705, 715, 63 S.Ct. 920, 925, 87 L.Ed. 1094 (1943). More pointedly, there is no longer any doubt as to a tribe's capacity to sue in federal court. 28 U.S.C. § 1362. Defendants fail to suggest any persuasive reason as to why anachronistic notions of tribal capacity should now restrain the Cayugas from invoking a statute enacted for their benefit.

Moreover, it is a cardinal rule of construction that a statute framed in general terms embraces conditions arising in the future not known at the time of enactment. *Delima v. Bidwell,* 182 U.S. 1, 197, 21 S.Ct. 743, 753, 45 L.Ed. 1041 (1900); *United States v. Browder,* 113 F.2d 97, 99 (2d Cir. 1940). Without this principle, there would be continual doubt as to the right of married women, blacks, Indians, and others to invoke statutes enacted in periods when their predecessors had lacked capacity to sue. The principle is not in derogation of legislative intent, but rather extrapolates legislative intent to post-enactment circumstances. *See,* R. Dickerson, *The Interpretation and Application of Statutes,* 127–29 (1975). By extension, then, a statute enacted for the benefit of Indians contemplates a tribal right of action once extraneous barriers to that right of action have ceased to exist.

For the reasons set forth above, the Court finds that the Cayugas' right to maintain this possessory action is derived from federal common law, from the right of the United States to maintain the action as trustee, and from the Nonintercourse Act itself, under the *Rigsby* analysis.

## XII. ABATEMENT

Finally, the defendants contend that plaintiffs' right to sue under the 1793 and 1802 Nonintercourse Acts has "abated" due to the repeal of those statutes. The common law doctrine upon which they rely was stated by Chief Justice Marshall in *The General Pinkney,* 9 U.S. (5 Cranch) 281, 283, 3 L.Ed. 101 (1809):

> [I]t has been long settled, on general principles, that after the expiration or repeal of a law, no penalty can be enforced, nor punishment inflicted for violations of the law committed while it was in force, unless some special provision be made for the purpose by statute.

Chief Justice Taney later stated the rule with even greater brevity: "The repeal of a law imposing a penalty is itself a remission." *Maryland v. The Baltimore & Ohio R.R. Co.,* 44 U.S. (3 How.) 534, 552, 11 L.Ed. 714 (1845).

■ Accepting defendants' premise that the 1793 and 1802 Nonintercourse Acts have either expired or have been repealed,[15] the defense of abatement is nonetheless inapplicable for several reasons. First, the defense is dependant upon a characterization of plaintiffs' claim as a private action to enforce the Nonintercourse Act. As discussed previously, however, plaintiffs' claim is also properly characterized as an action in ejectment asserting possessory rights confirmed by federal treaty. So viewed, the repeal of any particular Nonintercourse statute would not disable plaintiffs from asserting their claim.

But even if the action were deemed one arising under the Nonintercourse Act, the Court cannot accept the view that the pertinent clause in the Nonintercourse Act which plaintiffs seek to enforce imposes a "penalty" or "punishment" which would be subject to abatement. The relevant clause declares that certain transactions in land are of no validity in law or equity. The purpose of this restraint against alienation, as discussed at length above, was to protect Indian possessory rights. Under the rule of *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), such provision is not penal:

> This Court has been called upon to decide whether or not various statutes were pe-

---

**15.** The Trade and Intercourse Acts of 1790, 1793, 1796, and 1799 were all acts of limited duration; the first three were made operative "for the term of two years, and from thence to the end of the next session of Congress, and no longer", *Act of 1790* § 7; *Act of 1793* § 15; *Act of 1796* § 22. The last was made operative for three years. *Act of 1799* § 21.

The 1793 Act was expressly repealed by section 21 of the 1796 Act. It is arguable, however, that a right of action under the 1793 Act was preserved by a limited savings clause in section 21 which provided that:

> all disabilities, that have taken place, shall continue and remain; all penalties and forfeitures, that have been incurred, may be recovered; and all prosecutions and suits, that may have been commenced, may be prosecuted to final judgment, under the said act or acts, in the same manner, as if the said act or acts were continued, and in full force and virtue.

Whatever effect this savings clause had, it terminated when the savings clause itself expired in 1802. The Trade and Intercourse Act of that year, which was the first such Act of unlimited duration, contained no such savings provision.

Thus defendants are correct in their statement that the Nonintercourse Act of 1793, which was in effect at the time of the challenged land transaction of 1795, has expired or has been repealed, and has not been preserved continuously by any savings clause.

The Act of 1802 was in effect at the time of the second challenged land transaction in 1807, and it remained in effect until superceded by the Next Trade and Intercourse Act of 1834. The new Act expressly continued the effectiveness of the prior Act with respect to Indian tribes residing east of the Mississippi. *Act of 1834* § 29.

The 1834 Act continued in effect until Congress enacted the Revised Statutes in 1874. Defendants contend that a possessory action based on the pre-1874 Nonintercourse Act was made unavailable by the general repealer in the Revised Statutes, § 5596, and was not preserved by the general savings clause in the Revised Statutes, found in § 13 (now at 1 U.S.C. § 109). Because the Court has determined, for reasons set forth, *infra,* that this possessory action has not been abated irrespective of whether the Nonintercourse Statute of 1834 survived the enactment of the Revised Statutes of 1874, it is not necessary to address the intricate question of what rights were terminated by the repealer and what rights were preserved by the savings clause.

nal ever since 1798. *Calder v. Bull* [3 U.S.], 3 Dall. 386, 1 L.Ed. 648 ... In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute. If the statute imposes a disability for the purpose of punishment—that is, to reprimand the wrongdoer, to deter others, etc., it has been considered penal. But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose.

*Id.* at 95–96, 78 S.Ct. at 595.

It is clear that every Nonintercourse Act since 1793 has contained some penal provision within it which, arguably, is subject to abatement. For example, it may well be that the provision in the 1793 statute which imposed upon violators a "fine not exceeding one thousand dollars, and imprisonment not exceeding twelve months" became unenforceable once that statute was repealed (or at least once the savings clause expired). This application would appear consistent with Chief Justice Marshall and Chief Justice Taney's statement of the rule. Indeed, the cases cited by the defendants in which the abatement doctrine was employed involved precisely such type of penal provisions. *See, e.g., United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801) (vessel condemnation); *The General Pinkney, supra,* 9 U.S. (5 Cranch) 281, 3 L.Ed. 101 (vessel condemnation); *Norris v. Crocker,* 54 U.S. (13 How.) 429, 14 L.Ed. 210 (1851) ($500 penalty); *United States v. Tynan,* 78 U.S. (11 Wall.) 88, 20 L.Ed. 153 (1870) (fine or imprisonment); *United States v. Chambers,* 291 U.S. 217, 54 S.Ct. 434, 78 L.Ed. 763 (1934) (fine or imprisonment); *Hamm v. City of Rock Hill,*

379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964) (fine or imprisonment).[16]

The clause in the Nonintercourse Act which invalidates certain conveyances is wholly unlike the penal provisions held abated in the cases above. Though enforcement could work great hardship upon those who claim title through a transaction which is invalid under the Act, it is nevertheless manifest that the statutory disability was established not to punish, but to accomplish "some other legitimate governmental purpose." *Trop v. Dulles, supra,* 356 U.S. at 96, 78 S.Ct. at 595. Thus, plaintiffs' claim based upon the statutory disability did not abate upon the repeal of the specific version that was in effect at the time of the challenged transaction.

Moreover, the rationale of the abatement doctrine counsels against its application here. The cases in which the doctrine has been invoked typically involve situations wherein conduct that was punishable when committed became legal at some point before final judgment in the case had been rendered. For example, in *United States v. Chambers, supra,* defendant's conviction for conspiracy to violate the National Prohibition Act was vacated because, while his appeal was pending, the 21st Amendment was adopted, repealing Prohibition. Similarly, in *Hamm v. City of Rock Hill, supra,* the Court dismissed trespassing charges against civil rights "sit-in" participants because, though such conduct was illegal when committed, the intervening enactment of the Civil Rights Act of 1964 legalized the conduct and abated further prosecutions. *See also, United States v. The Schooner Peggy, supra* (vacating the condemnation of a vessel which was hostile when seized, because a United States-

---

**16.** One remaining case cited by the defendants does involve a non-penal remedy, but does not involve abatement. In *Gulf, Colorado & Santa Fe Ry. Co. v. Dennis,* 224 U.S. 503, 32 S.Ct. 542, 56 L.Ed. 860 (1911) the question was whether an award of attorneys fees to a prevailing plaintiff under a state statute should be affirmed even though, while the appeal was pending, the state court declared the attorneys fees statute unconstitutional. In the course of holding that the intervening declaration of in-

validity must be recognized on appeal, the Court referred to the abatement doctrine by analogy. It extrapolated from the abatement cases a general principle that a court on appeal must "recognize the changed situation, and either apply the intervening law or decision, or set aside the judgment and remand." Thus, *Dennis* hardly stands for the proposition that a right of action exists only so long as the original statute creating the right exists.

French treaty ended hostilities before the condemnation became final); *The General Pinkney, supra* (vacating the condemnation of a vessel which had illegally traded at St. Domingo, because during appeal such trade became legal).

█ The circumstances here stand in stark contrast to those in the abovementioned cases. The very first Nonintercourse Act provided that conveyances of land, absent federal consent, were invalid. That provision has been continually re-enacted in substance, and "has remained the policy of the United States to this day." *Oneida v. County of Oneida, supra,* 414 U.S. at 668, 94 S.Ct. at 777. *See,* 25 U.S.C. § 177. Where, as here, identical or substantially similar statutory provisions have continually been in force, the subsequent legislation is to be construed as a continuation of the previous legislation, despite formal repeal. *Bear Lake Irrigation Co. v. Garland,* 164 U.S. 1, 11–12, 17 S.Ct. 7, 9, 41 L.Ed. 327 (1876); *Steamship v. Joliffe,* 69 U.S. (2 Wall.) 450, 456, 17 L.Ed. 805 (1864).

Defendants argue that *Norris v. Crocker, supra,* holds otherwise and is controlling. In *Norris,* the owner of a fugitive slave brought an action to recover a statutory penalty against a person who allegedly violated the Fugitive Slave Act of 1793. While the action was pending, Congress replaced the 1793 Act with the Fugitive Slave Act of 1850. Although the Acts shared a common purpose, to penalize those who assist fugitive slaves, the Court held that the claim arising under the earlier statute had abated, and was no longer enforceable.

*Norris* is reconcilable with *Bear Lake, supra.* In *Norris,* Justice Catron emphasized that the relevant provision in the new Act was "new and inconsistent with the 4th section of the act of 1793" with respect to the nature of remedies available to slaveowners. 54 U.S. (14 How.) at 472. Since the specific remedy that the plaintiff sought was no longer available under the new Act, the Court found it proper to dismiss the action. In short, the two statutes in *Norris* did not exhibit the continuity

which enables an action to avoid abatement under the rule of *Bear Lake* and *Joliffe.*

Quite clearly, that requisite continuity of statutory policy is present in the case at bar. Plaintiffs' first claim arose under the 1793 Act, which provided in pertinent part:

> That no purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the Constitution.

The 1796, 1799, and 1802 versions of the Act exhibit only the minor change underscored below:

> That no purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian, or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

The 1834 version applies only to "any Indian nation or tribe of Indians", but is otherwise identical to its predecessor, as is the current version, 25 U.S.C. § 177.

In view of the nonpenal nature of the nonalienability clause in the 1793 and 1802 Acts, and in view of the continuous effectiveness of the statutory protection of Indian lands, the Court finds that plaintiffs cause of action has not abated.

## XIII. CONCLUSION

Tribal land claim litigation attracts considerable attention and apprehension among non-Indians, and not merely among those in the claim areas. This is understandable given the size and location of the claimed lands and the drastic nature of the remedy sought. Indeed, the prospect of the most drastic conceivable remedies is extremely disturbing, and has tended to pervade and disrupt the impartial determination of the issues raised on this motion to dismiss. That it must not do. It is the duty of the Court, at this juncture, to ascertain whether it has jurisdiction over the subject-mat-

ter and the parties, whether the claim is justiciable and timely, and whether the complaint states a violation of Indian possessory rights. Those questions we must answer affirmatively. The Cayugas are therefore entitled to present evidence in support of their claim.

Defendants' motions under Rules 12(b)(1), (2), and (6) are denied. It is so ordered.